

**SO ORDERED.**

**SIGNED this 17 day of December, 2007.**

/s/ Dale L. Somers
Dale L. Somers
UNITED STATES BANKRUPTCY JUDGE

_____

Opinion Designated for Electronic Use, But Not for Print Publication
IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In Re: | |
| ASHRAF FOUAD HASSAN, | CASE NO. 04-20332-7 |
| IRINA HASSAN, | CHAPTER 7 |
| DEBTORS. | |
| CHRISTOPHER J. REDMOND, Trustee, KANSAS EXPRESS INTERNATIONAL, INC., | |
| PLAINTIFFS, | |
| v. | ADV. NO. 05-6215 |
| ASHRAF FOUAD HASSAN, BILAL SAID, INTERNATIONAL FOOTBALL CLUB, INC., OVERLAND PARK SPORTS COMPLEX, LLC, TERRA SPORTS GROUP, LLC, TERRA VENTURE, INC., | |

| |
|---|
| **TERRA VENTURE INVESTMENTS, LLC,**<br>**ANALYTICAL MANAGEMENT LABORATORIES, INC.,**<br>**MARK MURPHY,**<br>**THE MURPHY LAW FIRM, P.A.,**<br><br>     **DEFENDANTS,**<br><br>and<br><br>**FINAL TOUCH, INC.,**<br>**KANSAS CITY LIMOUSINE, INC.**<br>  **AND BUDGET LIMOUSINE,**<br>**AL MOSER,**<br>**DIANE MOSER,**<br><br>    **DEFENDANTS &**<br>  **THIRD-PARTY PLAINTIFFS,**<br><br>v.<br><br>**STEVEN G. LORD,**<br>**BROADMOOR CAPITAL, INC.,**<br>**BROADMOOR CAPITAL**<br>  **CONSULTING, LLC,**<br><br>  **THIRD-PARTY DEFENDANTS.** |

## OPINION GRANTING IN PART PLAINTIFF-TRUSTEE'S MOTION
## FOR PARTIAL SUMMARY JUDGMENT

This proceeding was before the Court on September 26, 2007, for oral argument on the Plaintiff-Trustee's motion for summary judgment on the question whether money some of the defendants paid in a transaction with Defendant-Debtor Ashraf Fouad Hassan

2

is property of the Debtors' bankruptcy estates. At the hearing, the Trustee[1] appeared by counsel Mark T. Benedict and Scottie Sue Kleypas of Husch & Eppenberger of Kansas City, Missouri. The Debtor appeared by counsel Frederick H. Riesmeyer, II, of Spradley & Riesmeyer of Kansas City, Missouri. Defendants Mark Murphy and the Murphy Law Firm appeared by counsel Daniel F. Church of McAnany, Van Cleave & Phillips of Roeland Park, Kansas. Defendants Terra Venture, Inc., and Terra Venture Investments, LLC, appeared by counsel Sharon L. Stolte of Stinson, Morrison Hecker of Overland Park, Kansas, although she has since withdrawn from representing them. Defendants Bilal Said, International Football Club, Overland Park Sports Group, LLC, and Analytical Management Laboratories, Inc., appeared by counsel Richard C. Wallace of Evans & Mullinix of Shawnee, Kansas. Defendant-Third-Party-Plaintiff Al Moser appeared on his own behalf. There were no other appearances. The Court has reviewed the parties' pleadings, heard the arguments of counsel, and is now ready to rule on the motion for partial summary judgment.

**FACTS**

*1. The Debtor's transaction with Al Moser*

For purposes of the Trustee's motion, the following relevant facts have been

---

[1] Technically, the Trustee is acting both as the trustee of the Debtors' bankruptcy estate and as the owner of the stock of Kansas Express International, Inc., which became property of the estate when the Debtors filed their bankruptcy petition. But since he always advocates a single position in both capacities, the Court will simply refer to him as "the Trustee," no matter which capacity might be relevant to the discussion at the moment, in order to make this opinion easier to follow.

properly established.[2]

On February 3, 2004, Defendant-Debtor Ashraf Hassan and his wife filed a voluntary petition for bankruptcy relief pursuant to Chapter 7 of the Bankruptcy Code. Before filing, the Debtor had operated a limousine and taxi service ("Limousine Business"). The Debtor's wife apparently had little to do with the Limousine Business, although her credit standing was used to obtain vehicles for it. The Debtor formed two corporations, Kansas Express, Inc., and Kansas Express International, Inc., but neither of them ever issued any stock. He used those as well as a number of other names for his Limousine Business. The Debtor did not follow corporate formalities and the corporations' charters were forfeited for failing to file annual reports. In the main bankruptcy case, an order has been entered to substantively consolidate the Debtors' bankruptcy estates with the two corporations and another corporate name, Kansas International, Inc., the Debtor used without forming a corporation.

In Schedule B of their bankruptcy papers, the Debtors reported owning stock or interests in a worthless corporation. They listed the corporation's name as "Kansas International, Inc." On their Statement of Financial Affairs, the Debtors reported having a little less than $5,000 in income from "Kansas International" in 2001 and a loss of over

---

[2]In their written responses to the Trustee's motion, the Debtor and the Murphy Defendants complained that a number of documents submitted to support the Trustee's motion were unsworn, uncertified, and unauthenticated. Two days before the hearing, the Trustee supplemented his motion by submitting certified copies of some of the documents and affidavits concerning the others complained of. During the hearing, neither the Debtor nor the Murphy Defendants mentioned the previously-asserted insufficiency of the Trustee's supporting documents, so they were presumably satisfied by the supplemental materials.

4

$17,000 from the same business in 2002.

About seven weeks after filing for bankruptcy, on March 26, the Debtor began making arrangements for a transaction with Defendant Al Moser. The Debtor and Moser disagree who approached whom about the transaction, but no one questions that they ultimately signed an agreement. The Debtor told Moser the Limousine Business generated net income of $12,000 to $15,000 per month. On various dates, Moser received other information about the Limousine Business from Steve Lord, a broker who had been trying to sell the business for the Debtor. On May 14, Lord faxed Moser a December 2001 list of the business's office inventory with stated values totaling over $300,000, plus an assertion the business had goodwill based on: over 2,000 repeat clients, successful operation for over ten years, a number of trained employees, brochures, a Web site, and Yellow Pages advertising.

On May 17, the Debtor, Lord, and Moser met with attorney Mark Murphy of the Murphy Law Firm (together, the "Murphy Defendants"). As a result of that meeting, the Murphy Defendants sent an engagement letter to the Debtor and to Moser and his wife, Diane. The letter stated the law firm was being hired "to prepare all necessary documentation and advise both [the Debtor], as the seller, and [the Mosers], as the purchasers, of all of the capital stock of Kansas Express International, Inc., which is owned by [the Debtor]." The Debtor indicated his acceptance of the terms of the engagement letter by signing it both individually and as president of Kansas Express International, Inc., and the Mosers both signed it to indicate their acceptance of the terms.

5

On May 26 and 27, Moser paid the Debtor a total of $96,000 towards the transaction, and on May 28, the day they first signed an agreement, he paid another $9,000. Moser made more payments on various dates in June, so by the end of that month, he had paid the Debtor a total of $129,420.

On May 28, 2004, the Debtor and Moser and his wife signed a fourteen-page "Stock Purchase Agreement" drafted by Murphy. They also signed a seven-page "Pledge Agreement" that had a one-page exhibit attached to it. The Stock Purchase Agreement stated that the Debtor was the owner of "all the issued and outstanding shares of Kansas Express International, Inc., a Kansas corporation," and did not mention the possibility he used any other names in operating his business. On the closing date, the Debtor was to sell the Mosers all his stock for $550,000. The Mosers were to make a down payment of $105,000, which is the amount Moser had paid by the date of the Stock Purchase Agreement. In the Pledge Agreement, the Mosers pledged the stock they were buying as security for the note they were giving the Debtor. The Mosers were to pay another $170,000 at the closing of the sale, and give the Debtor a promissory note for the remaining $275,000, secured by the stock the Debtor was selling. The closing was set for July 1 or another date if the parties agreed to change it.

The Stock Purchase Agreement described 16 documents and said they were all attached to the agreement, but none of them have been produced in connection with the Trustee's motion, nor has anyone suggested any of them were ever actually prepared and presented to the Debtor and the Mosers when they signed the agreement. Instead, the

6

Pledge Agreement, mentioned in the Stock Purchase Agreement but not said to be attached to it, is the only document the parties have submitted in connection with the Trustee's motion that was involved when the Debtor and the Mosers signed documents for the transaction on May 28, 2004. The Court has not been informed whether any promissory note (called exhibit 1 to the Stock Purchase Agreement) was actually prepared and signed by the Mosers.

The Stock Purchase Agreement includes other provisions that could have a bearing on the Trustee's motion. Paragraph 9(f) says a variety of assets and obligations of the corporation — for example, interests in real and personal property, contracts to which the corporation is a party, and accounts receivable — are described or listed on attached exhibits. Paragraph 11(c) says "**Consultation of [the Debtor]**. [The Mosers'] obligation to close shall be subject to [the Debtor's] covenant and agreement to enter into the consulting agreement attached hereto as Exhibit 16." In paragraph 14, the Debtor agreed to a ten-year covenant not to compete with the corporation's business. As indicated, although many exhibits were mentioned in and said to be attached to the Stock Purchase Agreement, the only other document that was before the parties on May 28, 2004, and that has been presented to the Court is the Pledge Agreement. The conspicuous absence of the 16 exhibits described in the Stock Purchase Agreement leads the Court to conclude none of them was ever prepared. Under the Stock Purchase Agreement, then, there can be no doubt that the Mosers were buying the Debtor's Limousine Business, and not his promise to work for them after the business was transferred to them. If the Debtor's

7

consulting services had anything to do with the transaction at that point, an agreement concerning them would have been prepared and signed by the parties.

After signing the Stock Purchase Agreement, Moser formed a corporation to own and operate the Limousine Business he would own once the transaction with the Debtor was closed.

On June 29, 2004, Moser learned of the Debtor's bankruptcy filing, and he told Murphy about it on July 2. Murphy accessed this Court's electronic file system, and obtained information about the Debtor's bankruptcy case. According to Moser, Murphy then told him and the Debtor the only option was for the agreement to be revised and restructured to elaborate and expand on the Debtor's consulting services. In a deposition, Murphy said the parties discussed the matter and concluded the Debtor was selling his services, and not his valueless business; the contract was revised to reflect this alleged reality. The parties all admit Murphy then produced a revised fourteen-page agreement that was labeled simply "Agreement" and that said it was "made and entered into effective" on May 28, 2004, the date the Stock Purchase Agreement had been signed. Despite its date, the Debtor and Moser, as president of his new corporation, signed this new agreement ("Second Agreement") on July 6, not May 28. In the Second Agreement, Moser's company replaced Moser and his wife as the party named on their side of the transaction.

In the Second Agreement, the parties agreed to a reduced price of $300,000 because Moser could not verify the $12,000 to $15,000 per month net income the Debtor

8

had told him the Limousine Business generated. The Second Agreement still said the Debtor was the sole owner of Kansas Express International, Inc., which operated a limousine business, but instead of transferring the corporation's stock, it called for the Debtor to terminate the corporation's business operations, including any other names under which it had conducted business, such as Kansas International, Inc., Kansas Express Limousine, and Black Tie Limousine. The agreement said the Debtor was to "provide his services to [Moser's company] as an independent contractor/consultant." The Debtor was to provide "services and consultation to the best of his ability, and to use his best efforts, skill and ability to promote the interests" of Moser's company; he could not assign or delegate his obligations; and he was to provide up to a maximum of one hundred hours of services per calendar month for one year.

Under the Second Agreement, Moser's company was to pay $129,000 to the Debtor on or before the closing,[3] and another $171,000 at the closing. Moser's company was also to pay the Debtor "Incentive Payments" if the company's gross revenues reached certain levels from July to December 31, 2004. The Debtor agreed to a six-year covenant not to compete, and $50,000 of the $171,000 closing payment was declared to be attributable to the covenant. The Debtor and Moser (as president of his company) signed the Second Agreement on July 6, 2004, and the Debtor was given the $171,000 payment called for. The total amount Moser and his company paid the Debtor under the

---

[3]Moser had actually paid $129,420 by this time, but the parties seem to have ignored the extra $420.

9

agreements was $300,420.

Although the Second Agreement no longer explicitly said the Debtor was transferring anything to Moser's company other than his promise to provide future services, it stated that the Debtor warranted he was the sole owner of all the stock of Kansas Express (that is, all of his Limousine Business), and that extensive information about the assets and obligations of the Debtor's Limousine Business had been provided to Moser's business, including lists of its real and personal property, its contracts, and its accounts receivable. In another provision, the Debtor warranted that the Limousine Business's assets were in good operating condition and repair as of the closing. Since he was supposed to be shutting down his business, including these provisions in the contract makes little sense unless the parties still intended that assets in addition to the Debtor's promise to provide future services were being transferred to Moser's business. In fact, in a paragraph conditioning the obligations of Moser's business under the Second Agreement, the contract said the Debtor "by having closed the sale of their [sic] stock hereunder, shall be deemed conclusively to have certified at Closing that all such representations and warranties were true on and as of the Closing Date."

Fairly soon after the parties signed the Second Agreement, the Debtor provided a copy of it to his bankruptcy attorney (who was not Murphy), and on July 26, that attorney sent a copy to the Trustee. The Debtor did not tell the bankruptcy attorney about the Stock Purchase Agreement or give him a copy of it.

2. *Facts supporting abandonment defense*

10

On May 4, 2004, the Trustee filed a first interim report in the Debtor's main bankruptcy case. The Murphy Defendants and the Debtor point out that on the report, in a line for the "Stock/Interest in Kansas Interinational [sic], Inc.," the Trustee put "DA" in a column labeled "Property Abandoned." At the top of the column, two codes are identified: (1) "OA = § 554(a) abandon," and (2) "DA = § 554(c) abandon." So, when the Trustee put "DA" in the line for the Debtors' stock, he meant he intended to abandon that property under § 554(c). The Murphy Defendants and the Debtor also point out that the Debtors' discharges were entered two weeks later, on May 18. They contend these facts mean the Debtor's Limousine Business ceased to be property of the bankruptcy estate before the Debtor and the Mosers signed the Stock Purchase Agreement on May 28.

**DISCUSSION**

Although a number of other claims have been asserted in this proceeding, the Trustee now asks the Court to determine by summary judgment only that all the money Moser and his company paid to the Debtor in their transaction constitutes property the bankruptcy estate. The Defendants who oppose the motion argue: (1) the Trustee abandoned the estate's interest in the Debtor's Limousine Business before the Debtor's transaction with Moser began, so none of the money the Debtor received became property of the estate; (2) even if the Trustee did not abandon the Limousine Business, the transaction was a transfer of the Debtor's promise to provide his personal services to Moser and his company, rather than a transfer of the Debtor's Limousine Business, and

11

the Debtor's post-bankruptcy promise to provide personal services is not property of the estate; and (3) even if the transaction included a transfer of property of the estate (the Debtor's Limousine Business), it also included a transfer of property that is not property of the estate (the Debtor's post-bankruptcy promise to provide personal services), and the Trustee has not provided sufficient evidence to enable the Court to apportion the money the Debtor received between the property that belongs to the estate and the property that does not belong to it.

*a. Summary judgment standards.*

Under the applicable rules of procedure, the Court is to grant summary judgment if the moving party demonstrates that there is "no genuine issue of material fact" and that the party "is entitled to a judgment as a matter of law."[4] The substantive law identifies which facts are material.[5] A dispute over a material fact is genuine when the evidence is such that a reasonable fact finder could resolve the dispute in favor of the party opposing the motion.[6] In adjudicating disputes, bankruptcy courts usually both determine the law and find the facts. In deciding a summary judgment motion, though, the Court is limited to its role of deciding legal questions, not weighing the evidence and resolving factual disputes, but merely determining whether the evidence favorable to the non-moving party

---

[4]Fed. R. Civil P. 56(c), made applicable by Fed. R. Bankr. P. 7056.

[5]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[6]*Id.*

12

about a material fact is sufficient to require a trial[7] at which the Court would act in its fact-finding role. Summary judgment is inappropriate if an inference can be drawn from the moving party's materials that would allow the non-moving party to prevail at trial.[8]

*b. The Trustee did not abandon the Debtor's Limousine Business.*

Section 554 of the Bankruptcy Code governs abandonment. As relevant here, it provides: "(c) Unless the court orders otherwise, any property scheduled under section 521(a) of this title not otherwise administered at the time of the closing of the case is abandoned to the debtor and administered for purposes of section 350 of this title." The Defendants point out that the Trustee's first interim report refers to abandoning the Debtors' stock in Kansas International, Inc., and that the Debtors have received discharges. However, the interim report indicates the Trustee was planning to abandon the stock under § 554(c). That provision makes abandonment effective only when the case is closed, unless the Court orders otherwise. The entry of the debtor's discharge has no impact on the provision's operation. The Debtors' case has not been closed, and the Defendants have not suggested any order provided for an earlier abandonment. Consequently, the report's reference to abandonment did not cause the stock or any other part of the Debtors' Limousine Business to leave the bankruptcy estate.[9]

---

[7]*Id*. at 249-52.

[8]*Id.* at 248.

[9]*See In re Shelby*, 232 B.R. 746, 750–52 (Bankr. W.D. Mo. 1999) (holding trustee does not abandon property by listing intent to abandon on interim report).

13

*c. The Stock Purchase Agreement was selling only property of the bankruptcy estate, and the money paid under that agreement is proceeds of property of the estate, and therefore is also property of the estate.*

Under § 541(a)(1) of the Bankruptcy Code, with certain exceptions not involved here, property of the estate includes " all legal or equitable interests of the debtor in property as of the commencement of the case." The Debtor clearly owned his Limousine Business before he and his wife filed for bankruptcy, so that business became property of the estate. Section 541(a)(6) adds that the estate also includes "[p]roceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case." The Trustee argues the Debtor was simply selling his Limousine Business to Moser, so the money paid in the transaction was all proceeds of property of the estate, while the Defendants respond that the Debtor was really selling only his personal services and know-how and that any assets of his Limousine Business being transferred were worthless.

The Court is convinced the Murphy Defendants' engagement letter, the Stock Purchase Agreement, and the absence of any employment agreement or other contract before the Second Agreement for the Debtor to provide services to Moser establish that all the payments Moser (or his company) made before the Second Agreement was created were made to buy the Limousine Business from the Debtor and not to obtain his services for Moser's own business. This means the $129,420 paid by the end of June 2004 all

14

constituted proceeds of the Debtor's Limousine Business, and therefore, property of the estate under § 541(a)(6).

*d. The $50,000 paid under the Second Agreement for the Debtor's covenant not to compete is property of the estate, but the Court cannot now apportion the rest of the money paid under that agreement between proceeds of property of the estate, and proceeds that do not belong to the estate.*

Unlike the Stock Purchase Agreement, the Second Agreement at least gave the appearance of changing the parties' transaction to constitute mainly a transfer of the Debtor's postpetition promises to provide personal services and not to compete with Moser's business. The parties have raised the question whether the money paid for the Debtor's promise not to compete with Moser's business after the transaction was completed would be property of the estate or would be excluded from the estate by § 541(a)(6) as proceeds of personal services of the Debtor.[10] Courts have reached different conclusions on that issue, although they have usually been considering ongoing

---

[10]An interesting article suggests courts have been mistaken to analyze postpetition payments on prepetition contracts under § 541(a)(6) because the provision applies only to "proceeds, products, offspring, rents, or profits of or from property of the estate," and a debtor's right to such payments is instead among the "legal or equitable interests of the debtor in property as of the commencement of the case" that are brought into the estate by § 541(a)(1). Phillips & Shively, "Ruminations on Property of the Estate — Does Anyone Know Why a Debtor's Postpetition Earnings, Generated by her Own Earning Capacity, Are Not Property of the Bankruptcy Estate?," 58 La. L. Rev. 623 (1998). In this case, however, since the Stock Purchase Agreement and the Second Agreement were not created before the Debtor filed for bankruptcy, any money paid for the Debtor's promise not to compete with Moser's business could only come into the estate as proceeds of the Debtor's Limousine Business, so § 541(a)(6)'s exclusion of proceeds that are earnings from an individual debtor's personal services is properly relevant here.

15

postpetition payments owed on a contract created before the debtor filed for bankruptcy.[11] The Court agrees with the decisions that have ruled not performing services (that is, not competing) is not covered by § 541(a)(6)'s exception for performing services, and instead concluded the covenant not to compete is part of the sale of a business, helping to protect the goodwill that is being sold.[12] Consequently, money paid to the Debtor for his promise not to compete with Moser's business is not excluded from the bankruptcy estate by that exception. Having rejected the only grounds the Defendants have suggested might have prevented the money the parties attributed to the covenant not to compete from being property of the estate, the Court concludes the $50,000 was property of the estate.

Under the Second Agreement's language, probably most, if not all, of the remaining $121,000 Moser's company paid at the closing would have been for the Debtor's personal services and therefore excluded from the estate by the exception in § 541(a)(6). The Trustee has presented some evidence suggesting the Second Agreement's new form for the transaction was merely an effort to defraud the bankruptcy estate by hiding the true nature of the deal, but such fraud has not been established for summary judgment purposes, and the Court cannot conclude the Trustee has established that all of the $121,000 was necessarily paid to obtain only the Limousine Business. On

---

[11]*Compare, e.g., In re Andrews*, 80 F.3d 906, 909-11 (4th Cir. 1996) (payments are property of estate); *In re Johnson*, 178 B.R. 216, 218-21 (9th Cir. BAP 1995) (same); *In re Jones*, 181 B.R. 538, 541-43 (D.Kan. 1995) (same); *with In re Hammond*, 35 B.R. 219, 220-24 (Bankr. W.D. Okla. 1983) (payments are not property of estate).

[12]*See Andrews*, 80 F.3d at 909-11; *Johnson*, 178 B.R. at 219-20.

the other hand, even if the Second Agreement was completely legitimate, the Court cannot agree with the Defendants that none of the $121,000 was paid for that business. The Trustee might be able to convince the factfinder that in addition to the Debtor's postpetition promises to provide services and not to compete, assets of the Limousine Business were being transferred to Moser's company that were not, as the Defendants claim, worthless. Like his fraud claim, however, the Trustee has not established that a reasonable factfinder must accept this claim.

At this point, the uncontroverted facts are not sufficient to enable the Court to determine what portion of the remaining $121,000 paid under the Second Agreement was given to obtain the Limousine Business and what portion was given to obtain the Debtor's services.

**CONCLUSION**

For these reasons, the Court concludes the $129,420 that Moser paid the Debtor before and while the Stock Purchase Agreement and the Pledge Agreement were the only documents that defined their transaction was property of the bankruptcy estate, and that the $50,000 paid for the Debtor's covenant not to compete when the Second Agreement was closed was also property of the estate. The Trustee's motion for partial summary judgment is hereby granted to that extent. The Court rejects the abandonment defense. But the Court denies the Trustee's motion to the extent it seeks a declaration that the remaining $121,000 paid to the Debtor at the closing was property of the estate.

# # #

17

Case 05-06215    Doc# 314    Filed 12/17/07    Page 17 of 17