**SO ORDERED.**

**SIGNED this 21 day of December, 2010.**



_____
Dale L. Somers
**UNITED STATES BANKRUPTCY JUDGE**

_____

**Opinion Designated for Electronic Use, But Not for Print Publication**
**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| In Re: | |
| **ASHRAF FOUAD HASSAN,** | **CASE NO. 04-20332-7** |
| **IRINA HASSAN,** | **CHAPTER 7** |
| DEBTORS. | |
| **CHRISTOPHER J. REDMOND,** Trustee, | |
| **KANSAS EXPRESS INTERNATIONAL, INC.,** | |
| PLAINTIFFS, | |
| v. | **ADV. NO. 05-6215** |
| **ASHRAF FOUAD HASSAN,** | |
| **BILAL SAID,** | |
| **INTERNATIONAL FOOTBALL CLUB, INC.,** | |
| **OVERLAND PARK SPORTS COMPLEX, LLC,** | |
| **TERRA SPORTS GROUP, LLC,** | |
| **TERRA VENTURE, INC.,** | |
| **TERRA VENTURE INVESTMENTS,** | |

LLC,
ANALYTICAL MANAGEMENT
        LABORATORIES, INC.,
MARK MURPHY,
THE MURPHY LAW FIRM, P.A.,

                DEFENDANTS,

and

FINAL TOUCH, INC.,
KANSAS CITY LIMOUSINE, INC.
        AND BUDGET LIMOUSINE,
AL MOSER,
DIANE MOSER,

                DEFENDANTS &
        THIRD-PARTY PLAINTIFFS,

v.

STEVEN G. LORD,
BROADMOOR CAPITAL, INC.,
BROADMOOR CAPITAL
        CONSULTING, LLC,

        THIRD-PARTY DEFENDANTS.

**OPINION GRANTING PART OF THE PLAINTIFF-TRUSTEE'S
MOTION FOR SUMMARY JUDGMENT, BUT OTHERWISE DENYING
THE OPPOSING MOTIONS FOR SUMMARY JUDGMENT FILED BY
THE TRUSTEE AND THE MURPHY DEFENDANTS**

This proceeding is before the Court on opposing motions for summary judgment.

Defendants Mark Murphy and the Murphy Law Firm appear by counsel George D.

Halper and Daniel F. Church of McAnany, Van Cleave & Phillips, P.A., of Roeland Park,

2

Kansas.  Plaintiff-Trustee Christopher J. Redmond apears by counsel Christopher J. Redmond, P. Glen Smith, and Gabrielle A.J. Beam of Husch Blackwell Sanders LLP of Kansas City, Missouri.  The Court has reviewed the relevant materials, and is now ready to rule on the motions.

**FACTS**

Although there are numerous other parties to this proceeding, the summary judgment motions now before the Court directly concern only the Trustee's claims against Defendants Mark Murphy and the Murphy Law Firm ("the Murphy Defendants").

For purposes of the motions, except where disputes are noted, the following relevant facts are uncontroverted.

**1.  The Debtor's postpetition transaction with Al Moser and related parties, and the Murphy Defendants' participation in the transaction.**

On February 3, 2004, Defendant-Debtor Ashraf Hassan and his wife filed a voluntary petition for bankruptcy relief pursuant to Chapter 7 of the Bankruptcy Code. Before filing, the Debtor had operated a limousine and taxi service ("Limousine Business").  The Debtor's wife apparently had little to do with the Limousine Business, although her credit standing was used to obtain vehicles for it.  The Debtor formed two corporations, Kansas Express, Inc., and Kansas Express International, Inc., but neither of them ever issued any stock.  He used those names, as well as a number of others, for his Limousine Business.  The Debtor did not follow corporate formalities and the corporations' charters were forfeited for failing to file annual reports.  In the main

3

bankruptcy case, an order has been entered to substantively consolidate the Debtors' bankruptcy estates with the two corporations and another corporate name, Kansas International, Inc., the Debtor used without forming a corporation.

In Schedule B of their bankruptcy papers, the Debtors reported owning stock or interests in a worthless corporation. They listed the corporation's name as "Kansas International, Inc." On their Statement of Financial Affairs, the Debtors reported having a little less than $5,000 in income from "Kansas International" in 2001 and a loss of over $17,000 from the same business in 2002.

About seven weeks after filing for bankruptcy, on March 26, the Debtor began making arrangements for a transaction with Defendant Al Moser. The Debtor and Moser disagree who approached whom about the transaction, but no one questions that they ultimately signed an agreement. The Debtor told Moser the Limousine Business generated net income of $12,000 to $15,000 per month. On various dates, Moser received other information about the Limousine Business from Steve Lord, a broker who had been trying to sell the business for the Debtor. On May 14, Lord faxed Moser a December 2001 list of the business's office inventory with stated values totaling over $300,000, plus an assertion the business had goodwill based on: over 2,000 repeat clients, successful operation for over ten years, a number of trained employees, brochures, a Web site, and Yellow Pages advertising.

On May 17, the Debtor, Lord, and Moser met with attorney Mark Murphy of the Murphy Law Firm. As a result of that meeting, the Murphy Defendants sent an

4

engagement letter to the Debtor and to Moser and his wife. The letter stated the law firm was being hired "to prepare all necessary documentation and advise both [the Debtor], as the seller, and [the Mosers], as the purchasers, of all of the capital stock of Kansas Express International, Inc., which is owned by [the Debtor]." The Debtor indicated his acceptance of the terms of the engagement letter by signing it both individually and as president of Kansas Express International, Inc., and the Mosers both signed it to indicate their acceptance of the terms.

According to Murphy's sworn affidavit, the engagement letter "expressly provided that [he] would provide no legal advice to the buyer [the Mosers] and seller [the Debtor]," although he did not specify what language accomplished that. After the Mosers and the Debtor signed the letter, Murphy swears he "drafted a purchase agreement" based on their description of their transaction, but he "offered no legal advice to either of the parties regarding the transaction." He claims he "was retained to act solely as a scrivener of this agreement reached by the parties." Despite these assertions, the engagement letter identifies itself as an "Engagement Letter for Legal Representation." After the letter notes that having the Murphy Law Firm perform the work specified in the letter could raise conflicts, which Murphy had disclosed to the parties, the letter said the parties agreed to waive the conflicts and retain the firm, but "Should a conflict arise which cannot be resolved, we will withdraw from this transaction with regard to all parties in the matter, and you should then retain your own legal counsel to advise you." The letter specifies hourly rates the firm would charge for "legal fees and expenses," and

incorporates an attached sheet of "Standard Terms of Engagement" for the Murphy Law Firm, "Attorneys and Counselors at Law."

On May 26 and 27, Moser paid the Debtor a total of $96,000 towards the transaction, and on May 28, the day they first signed an agreement, he paid another $9,000. Moser made more payments on various dates in June, so by the end of that month, he had paid the Debtor a total of $129,420.

On May 28, 2004, Moser, his wife, and the Debtor signed a fourteen-page "Stock Purchase Agreement" drafted by Murphy. They also signed a seven-page "Pledge Agreement" that had a one-page exhibit attached to it. The Stock Purchase Agreement stated that the Debtor was the owner of "all the issued and outstanding shares of Kansas Express International, Inc., a Kansas corporation," but did not mention the possibility he used any other names in operating his business. On the closing date, the Debtor was to sell the Mosers all his stock for $550,000. The Mosers were to make a down payment of $105,000, which is the amount Moser had paid by the date of the Stock Purchase Agreement. In the Pledge Agreement, the Mosers pledged the stock they were buying as security for the note they were giving the Debtor. The attached exhibit is headed, "**Pledged Stock**" and reads,

> Kansas Express International, Inc, a Kansas corporation ("Issuer")
> One Hundred (100) Shares
> Certificate Number 2.

The Mosers were to pay another $170,000 at the closing of the sale, and give the Debtor a promissory note for the remaining $275,000, secured by the stock the Debtor was selling.

6

The closing was set for July 1 or another date if the parties agreed to change it.

The Stock Purchase Agreement described 16 documents and said they were all attached to the agreement, but none of them were produced in connection with an earlier summary judgment motion or the present motions, nor has anyone suggested any of them were ever actually prepared and presented to the Debtor and the Mosers when they signed the agreement. Instead, the only other document the parties have submitted in connection with any of the summary judgment motions that was involved when the Debtor and the Mosers signed documents for the transaction on May 28, 2004, is the Pledge Agreement, which was mentioned in the Stock Purchase Agreement but not said to be attached to it. In ruling on the Trustee's prior motion for partial summary judgment, the Court said the conspicuous absence of the 16 exhibits described in the Stock Purchase Agreement had caused the Court to conclude none of them was ever prepared. The Court notes none of the parties has produced any of the 16 exhibits in connection with the current motions, either, further solidifying the Court's conclusion the exhibits were never created.

The Stock Purchase Agreement included other relevant provisions. Paragraph 9(f) says a variety of assets and obligations of the corporation — for example, interests in real and personal property, contracts to which the corporation is a party, and accounts receivable — are described or listed on attached exhibits. In paragraph 14, the Debtor agreed to a ten-year covenant not to compete with the corporation's business. Paragraph 11(c) says "**Consultation of [the Debtor]**. [The Mosers'] obligation to close shall be subject to [the Debtor's] covenant and agreement to enter into the consulting agreement

7

attached hereto as Exhibit 16." As indicated, no such agreement has been produced. The Court has previously ruled that under the Stock Purchase Agreement, there could be no doubt that the Mosers were buying the Debtor's Limousine Business, and not his promise to work for them after the business was transferred to them. If the Debtor's consulting services had anything to do with the transaction at that point, an agreement concerning them would have been prepared and signed by the parties.

After signing the Stock Purchase Agreement, Moser formed a corporation to own and operate the Limousine Business he would own once the transaction with the Debtor was closed.

On June 29, 2004, Moser learned of the Debtor's bankruptcy filing, and he told Murphy about it on July 2. Nothing presented to the Court establishes for summary judgment purposes that Murphy was aware of the bankruptcy case before that. Murphy accessed this Court's electronic file system, and obtained information about the Debtor's bankruptcy case. According to the Murphy Defendants' reply in support of their motion and opposing the Trustee's motion, "After examining the bankruptcy filings and the . . . holdings [of the Debtor and the various corporations and names he used to operate his business], the parties determined there were no hard assets of any value to be transferred and Mr. Murphy revised the agreement to reflect the true nature of the transaction," and "After examining the bankruptcy filings and the . . . holdings [of the Debtor and the various corporations and names he used to operate his business], it was determined there were no hard assets of any value and that the Mosers were purchasing [the Debtor's]

8

knowledge and experience in the limousine business."[1]

According to Moser, Murphy told him and the Debtor their "only option" was for the agreement to be revised and restructured to elaborate and expand on the Debtor's consulting services. Moser concedes Murphy told him and the Debtor that they "may want to get separate bankruptcy counsel." In the Murphy Defendants' initial brief supporting their summary judgment motion, they say Murphy's first action on learning of the Debtor's bankruptcy case was to send the Debtor to his bankruptcy attorney to find out if the sale could go forward.[2] They do not say whether the Debtor contacted that attorney, or whether he reported to Murphy anything the attorney might have told him. In a deposition, Murphy said the parties discussed the matter and concluded the Debtor was selling his services, and not his valueless business; the contract was revised to reflect this alleged reality.

The parties all admit Murphy then produced a revised fourteen-page agreement that was labeled simply "Agreement" and that said it was "made and entered into effective" on May 28, 2004, the date the Stock Purchase Agreement had been signed. The Debtor and Moser, as president of his new corporation, signed this new agreement ("Second Agreement") on July 6, 2004. In the Second Agreement, Moser's company replaced Moser and his wife as the party named on their side of the transaction.

In the Second Agreement, the parties agreed to a reduced price of $300,000

---

[1]Docket No. 359 at p. 5, ¶9, and p. 6, second paragraph of ¶11.

[2]Docket no. 342 at 11.

9

because Moser could not verify the $12,000 to $15,000 per month net income the Debtor had told him the Limousine Business generated. The Second Agreement still said the Debtor was the sole owner of Kansas Express International, Inc., which operated a limousine business, but instead of transferring the corporation's stock, it called for the Debtor to terminate the corporation's business operations, "including any other names under which it operates or conducts business." The agreement said the Debtor was to "provide his services to [Moser's company] as an independent contractor/consultant." The Debtor was to provide "services and consultation to the best of his ability, and to use his best efforts, skill and ability to promote the interests" of Moser's company; he could not assign or delegate his obligations; and he was to provide up to a maximum of one hundred hours of services per calendar month for one year.

Under the Second Agreement, Moser's company was to pay $129,000 to the Debtor on or before the closing, and another $171,000 at the closing. Moser's company was also to pay the Debtor "Incentive Payments" if the company's gross revenues reached certain levels from July to December 31, 2004. The Debtor agreed to a six-year covenant not to compete, and $50,000 of the $171,000 closing payment was declared to be attributable to the covenant. The Debtor and Moser (as president of his company) signed the Second Agreement on July 6, 2004, and the Debtor was given the $171,000 payment called for. The total amount Moser and his company paid the Debtor under the agreements was $300,420.

Although the Second Agreement no longer explicitly said the Debtor was

10

transferring anything to Moser's company other than his promise to provide future services, it stated that the Debtor warranted he was the sole owner of all the stock of Kansas Express (that is, all of his Limousine Business), and that extensive information about the assets and obligations of the Debtor's Limousine Business had been provided to Moser's business, including lists of its real and personal property, its contracts, and its accounts receivable. In another provision, the Debtor warranted that the Limousine Business's assets were in good operating condition and repair as of the closing. Since he was supposed to be shutting down his business, including these provisions in the contract makes little sense unless the parties still intended that assets in addition to the Debtor's promise to provide future services were being transferred to Moser's business. In fact, in a paragraph conditioning the obligations of Moser's business under the Second Agreement, the contract said the Debtor "by having closed the sale of their [sic] stock hereunder, shall be deemed conclusively to have certified at Closing that all such representations and warranties were true on and as of the Closing Date."

Fairly soon after the parties signed the Second Agreement, the Debtor provided a copy of it to his bankruptcy attorney (who was not Murphy), and on July 26, that attorney sent a copy to the Trustee. The Debtor did not tell the bankruptcy attorney about the Stock Purchase Agreement or give him a copy of it.

From here on, the Court will use "the Moser Parties" to refer collectively to Moser, his wife, and his corporations.

Within a few weeks of their purchase of the Debtor's Limousine Business, the

11

Moser Parties rescinded or abandoned the contract with the Debtor and demanded their money back, but the Debtor refused to repay them. The Debtor apparently recovered or retained whatever tangible assets had been sold to the Moser Parties, and continued to operate his Limousine Business. In 2005, he sold the business to another company.

In January 2005, Murphy sent the Debtor an e-mail message with a draft agreement attached under which the Debtor would be selling "Kansas Express Limousine, a sole proprietorship," to Tess Limousine and Airport Services, Inc. Paragraph 4(b)(iv) of this draft stated:

> A prior agreement had been entered into by [the Debtor] with [the Moser Parties] for the sale of [the Debtor's] business to [the Moser Parties]; however, following the closing thereunder, on July 30, 2004 [the Moser Parties] abandoned all assets to be acquired thereunder, and failed to take assignment of the office lease, and the leases on the subject vehicles of this Agreement, also making no payments on either the office lease or the vehicles.

**2.     Comparing the affidavits of Al Moser submitted in support of the Trustee's prior motion for partial summary judgment and in support of his present motion.**

The Murphy Defendants suggest an affidavit Moser signed in support of the Trustee's present motion contradicts various points in one he signed in support of an earlier motion for partial summary judgment. At least fourteen times in replying to the Trustee's response to their statements of fact and responding to the Trustee's statements of fact, the Murphy Defendants say (with only minor variations), "The Moser affidavits are completely lacking in credibility and are insufficient to establish [the Trustee's]

12

assertion of fact."[3]  A careful comparison of the two affidavits reveals that the second one does not contradict the first, but merely adds non-conflicting information.

In the first affidavit, Moser said that on July 2, 2004, he told Murphy about the Debtor's bankruptcy case early in the morning, and that same day, he, his wife, and the Debtor met with Murphy about the bankruptcy case, and they agreed to reschedule the closing of the Stock Purchase Agreement.  In the second affidavit, Moser said the same things, but added that Murphy recommended rescheduling the closing date in order to research the impact of the bankruptcy on the transaction.  In the first affidavit, Moser said he, the Debtor, and Murphy met again on July 5, 2004, and he was told "our only option was if the Stock Purchase Agreement was revised and restructured to elaborate and expand on the consulting services of [the Debtor.]"  Because the sentence was written in passive voice, the person who told Moser about the "only option" was not identified.  In the second affidavit, Moser said of the same meeting, "Murphy advised us that he had spoken with a bankruptcy attorney and that because of the [Debtor's bankruptcy case] our *only option* to close and effectuate the sale of the Limousine Business was to revise and restructure the Stock Purchase Agreement, in order to elaborate and expand on the consulting services of [the Debtor]."[4]  The first affidavit contained no affirmative assertions that Murphy provided Moser with legal advice concerning the transaction, but never said he provided no legal advice.  In the second affidavit, in addition to adding the

---

[3]Docket no. 359 at 4-16.

[4]Emphasis in original.

assertions about Murphy's advice noted above, Moser said: "Murphy, as my attorney, advised me and [the Debtor] on how the sale of the Limousine Business under both the Stock Purchase Agreement and the Second Agreement was to be created and structured" and "I relied upon and followed the advice of Murphy in the creation, structure, and terms of the Stock Purchase Agreement, as well as in the creation, structure, and terms of the Second Agreement. . . ." Such additions do not make Moser's second affidavit so unbelievable that nothing in it can be relied on as support for the Trustee's motion.

**3. The Court's ruling on the Trustee's motion for partial summary judgment.**

On the Trustee's prior motion for partial summary judgment, the Court ruled that the $129,420 the Moser Parties paid the Debtor under the Stock Purchase Agreement was proceeds of the Debtor's Limousine Business, which was property of the bankruptcy estate and, therefore, the money was property of the estate under § 541(a)(6), and that the $50,000 the Moser Parties paid under the Second Agreement for the Debtor's covenant not to compete with their business was likewise proceeds of property of the estate and therefore, was property of the estate under § 541(a)(6). To that extent, the Court concluded the Trustee had established that none of the $179,420 was paid for the Debtor's promise to provide personal services to Moser's business. The Court ruled, however, that the Trustee had not established that all of the remaining $121,000 Moser paid after the Second Agreement was signed was necessarily paid only to obtain the Limousine Business, and could not have been paid for the Debtor's promise to provide personal services.

14

**4.      Facts relevant to the Murphy Defendants' *in pari delicto* defense.**

On March 22, 2007, the Trustee filed a motion to approve a settlement he had reached with the Moser Parties.  The other defendants in Adversary No. 05-6215, including the Murphy Defendants, objected, but the Court overruled their objections and orally approved the settlement on April 18, 2007, and signed a written order approving it about a week later.  Under the settlement, the Trustee and the Moser Parties are to employ joint efforts to pursue the claims asserted against the other defendants in the adversary proceeding.  They agreed:  (1) the Moser Parties will be allowed an administrative expense in the Debtor's bankruptcy case of about $440,000, but the Trustee's administrative expenses will be paid first out of any recovery, (2) the Moser Parties and the unsecured creditors will then split the recovery until the allowed unsecured claims, a little over $42,000, have been paid, and (3) the Moser Parties will then be entitled to the balance of the recovery.  After the allowed unsecured claims are paid in full, if the Moser Parties desire, the Trustee will continue to pursue the recovery of the balance of their administrative expense.

**Discussion**

**A.  Summary judgment standards**

Under the applicable rules of procedure, the Court is to grant summary judgment if the moving party demonstrates that there is "no genuine issue of material fact" and that

15

the party "is entitled to a judgment as a matter of law."[5]  The substantive law identifies

which facts are material.[6]  A dispute over a material fact is genuine when the evidence is

such that a reasonable factfinder could resolve the dispute in favor of the party opposing

the motion.[7]  In adjudicating disputes, bankruptcy courts usually both determine the law

and find the facts.  In deciding a summary judgment motion, though, the Court is limited

to its role of deciding legal questions, not weighing the evidence and resolving factual

disputes, but merely determining whether the evidence favorable to the non-moving party

about a material fact is sufficient to require a trial[8] at which the Court would act in its

factfinding role.  Summary judgment is inappropriate if an inference can be drawn from

the materials properly submitted either to support or oppose the motion that would allow

the non-moving party to prevail at trial.[9]

The substantive law's allocation of the burden of proof also affects the Court's

analysis of a summary judgment motion.  The party asking for summary judgment has the

initial burden of showing that no genuine issue of material fact exists.[10]  But if the moving

party does not have the burden of proof on a question, this showing requires only pointing

---

[5]Fed. R. Civil P. 56(c), made applicable by Fed. R. Bankr. P. 7056.

[6]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[7]*Id.*

[8]*Id.* at 249-50.

[9]*See id.* at 248.

[10]*Shapolia v. Los Alamos Nat'l Lab.,* 992 F.2d 1033, 1036 (10th Cir. 1993).

16

out to the Court that the other party does not have sufficient evidence to support a finding in that party's favor on that question.[11] When such a showing is made, the party with the burden of proof must respond with affidavits, depositions, answers to interrogatories, or admissions sufficient to establish that a finding on the question could properly be made in the party's favor at trial.[12]

As a general rule, questions involving a person's intent or other state of mind cannot be resolved by summary judgment.[13] But in an exceptional case, a person's "denial of knowledge may be so utterly implausible in light of conceded or irrefutable evidence that no rational person could believe it," making a trial on the question of the person's state of mind unnecessary.[14]

**B.     Overview of the parties' positions**

The Murphy Defendants seek summary judgment on all the claims the Trustee has asserted against them. The Trustee responds that he will withdraw and dismiss the claims that are based on the Murphy Defendants' alleged possession of any property of the bankruptcy estate, so the Court will not address those claims. The Trustee will continue,

---

[11]*Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

[12]*Celotex,* 477 U.S. at 324; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

[13]*Prochaska v. Marcoux,* 632 F.2d 848, 851 (10th Cir. 1980), *cert. denied* 451 U.S. 984 (1981); *see also* 10B Wright, Miller & Kane, *Fed. Prac. & Pro. Civil 3d,* §2730 (1998) (indicating actions involving state of mind can rarely be determined by summary judgment, except when the opposing party does not present sufficient circumstantial evidence to support a potential finding contrary to the person's professed state of mind).

[14]*In re Chavin*, 150 F.3d 726, 728-29 (7th Cir. 1998).

Case 05-06215   Doc# 375   Filed 12/21/10   Page 17 of 33

however, to pursue his claims: (1) to recover damages for civil conspiracy to defraud the bankruptcy estate, (2) to recover damages for civil conspiracy to convert estate property, and (3) to recover attorney fees. The parties agree the Trustee has the burden of proof on these claims. The Murphy Defendants argue that: (1) their *in pari delicto* defense bars all the Trustee's claims; (2) the first two claims must also fail because the Trustee cannot produce sufficient evidence to support a finding in his favor on one or more of the essential elements of each of them; and (3) the Trustee has failed to state a claim for recovery of attorney fees. In his opposing motion, the Trustee contends he is entitled to summary judgment on all the claims he is still pursuing against the Murphy Defendants.

## C.    The Murphy Defendants' *in pari delicto* defense.

The Court will first address the Murphy Defendants' *in pari delicto* defense because it would bar the Trustee's claims even if his allegations against the Murphy Defendants were all found to be true. The Murphy Defendants argue that by providing for the Trustee and the Moser Parties to jointly prosecute Adversary No. 05-6215, the Trustee's settlement with the Moser Parties makes the Trustee subject to the *in pari delicto* defense because the Moser Parties participated in any conspiracy that might be proven. They correctly note that the Tenth Circuit ruled in *Mosier v. Callister, Nebeker & McCullough* that a bankruptcy trustee's claims against parties who participated in a debtor's wrongdoing can be barred by that doctrine.[15] However, as the Trustee points out,

---

[15]546 F.3d 1271, 1275-77 (10th Cir. 2008).

18

the defense can be effective against a bankruptcy trustee when the parties the trustee is suing allegedly participated with the debtor in wrongful prepetition conduct because in that situation, the trustee stands in the shoes of the debtor and has no greater rights than the debtor had.[16]  That is, the trustee succeeds to the debtor's rights, receiving them together with the taint of the debtor's wrongdoing.

In this case, by contrast, the Debtor's allegedly wrongful conduct occurred postpetition and injured the bankruptcy estate, so the estate (and the Trustee as its representative) does not stand in the shoes of the Debtor.  The Murphy Defendants have cited no case holding that a bankruptcy trustee can forfeit otherwise valid claims by settling with some of the participants in alleged wrongdoing and agreeing to pursue the claims against others who allegedly also participated in the wrongdoing.  Kansas courts often look to the Restatement (Second) of Torts when considering tort questions,[17] and § 885(1) of that Restatement addresses precisely what occurred in this case.  It says an injured person's valid release of one tortfeasor from liability for harm does not discharge others from liability for the same harm, unless it is agreed it will discharge them.[18]  The Murphy Defendants do not contend the settlement included a provision discharging their alleged liability to the Trustee.  The Court concludes the *in pari delicto* defense does not

---

[16]*Id*. at 1275-76.

[17]*See e.g.  Scholfield Bros. v. State Farm Mut. Auto. Ins. Co.,* 242 Kan. 848, 850 (1988) (citing RESTATEMENT (SECOND) OF TORTS § 222A); *Snider v. MidFirst Bank,* 42 Kan.App.2d 265, 275 (2009) (quoting RESTATEMENT § 228); *see also Yount v. Diebert*, 282 Kan. 619, 631-34 (2006) (quoting RESTATEMENT § 876, but concluding it does not apply when comparative negligence is involved).

[18]RESTATEMENT (SECOND) OF TORTS, § 885(1) (1979).

19

apply in this case, and the Trustee's settlement with the Moser Parties does not affect his claims against the Murphy Defendants.

**D.      Kansas law of civil conspiracy**

The Murphy Defendants rely on two opinions explaining Kansas civil conspiracy law to support their summary judgment motion, the Tenth Circuit's decision in *McKibben v. Chubb*,[19] and the Kansas Supreme Court's decision in *Stoldt v. City of Toronto*.[20] *McKibben* quoted a statement of the elements of a civil conspiracy that *Stoldt* had quoted from an earlier decision,[21] which in turn had been quoting from *Corpus Juris Secundum*.[22] As indicated by all those authorities, under Kansas law, the elements of a civil conspiracy are:  "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate cause thereof."  The Murphy Defendants contend:  (1) the Trustee has produced insufficient evidence to support a finding that any of the allegedly conspiring parties committed any unlawful overt act; and (2) the elements of a civil conspiracy include a requirement that the conspiring parties had a specific intent to accomplish the contemplated wrong, and the Trustee has produced insufficient evidence to support a finding that they, the Murphy Defendants, had the intent to defraud the

---

[19]840 F.2d 1525, 1533 (10th Cir. 1988).

[20]234 Kan. 957, 966-67 (1984).

[21]*Citizens State Bank v. Gilmore*, 226 Kan. 662, 671 (1979).

[22]15A *Corpus Juris Secundum*, Conspiracy § 1(2), p. 599.

20

bankruptcy estate or to convert property of the estate. The Trustee disputes both contentions.

**E.      Overt unlawful act**

The Court will first consider the Murphy Defendants' argument that the Trustee cannot show any of the alleged conspirators committed an unlawful overt act as required to prove a conspiracy either to defraud the bankruptcy estate or to convert estate property.

The Trustee contends the Debtor defrauded the estate by giving his bankruptcy attorney a copy of the Second Agreement and asking him to give it to the Trustee, but failing to disclose the Stock Purchase Agreement and the Pledge Agreement, the original documents involved in his transaction with the Moser Parties. Under Kansas law, a person with knowledge of a material fact he or she was obliged but intentionally failed to communicate to another may be liable to the other for fraud by silence,[23] and a person who knowingly makes an untrue statement of fact to another with the intent to deceive or with reckless disregard for the truth may be liable to the other for affirmative fraud.[24] The Debtor's act of giving his attorney only one of the three documents created for his transaction with the Moser Parties might be found to constitute either of these types of fraud, so it could constitute the unlawful overt act necessary for the Trustee's conspiracy to defraud claim to succeed. If, in addition, the Trustee can convince the factfinder the

---

[23]*Miller v. Sloan, Listrom, Eisenbarth, Sloan & Glassman*, 267 Kan. 245, 260 (1999).

[24]*Bomhoff v. Nelnet Loan Servs., Inc.*, 279 Kan. 415, 422 (2005) (quoting elements of affirmative fraud as stated in *Alires v. McGehee*, 277 Kan. 398, Syl. ¶3 (2004)).

Case 05-06215    Doc# 375    Filed 12/21/10    Page 21 of 33

Murphy Defendants conspired with the Debtor to accomplish that unlawful overt act, they could also be liable for such fraud. On the other hand, the Trustee's evidence has not established that the Debtor necessarily acted with the state of mind required for him to be found to have defrauded the bankruptcy estate.

The Trustee contends the Debtor converted property of the estate by selling his Limousine Business to the Moser Parties and failing to turn the proceeds over to the Trustee. Under Kansas law, conversion is "the unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights."[25] As the Kansas Court of Appeals has said:

> Under Kansas law, "[c]onversion is a strict liability tort. [Citation omitted.] The required intent is shown by the use or disposition of property belonging to another, and knowledge or ignorance as to ownership of the property is irrelevant. [Citations omitted.]" *Commerce Bank, N.A., v. Chrysler Realty Corp.*, 76 F. Supp. 2d 1113, 1118 (D. Kan. 1999), *rev'd on other grounds* 244 F.3d 777 (10th Cir. 2001).[26]

So even a party's good faith belief that he had a superior right of ownership to the goods does not prevent him from being liable for conversion. In its prior summary judgment ruling, the Court concluded the money Moser paid to the Debtor under the Stock

---

[25]*Moore v. State Bank of Burden*, 240 Kan. 382, 386 (Kan. 1986) (citing *Carmichael v. Halstead Nursing Center, Ltd.*, 237 Kan. 495, Syl. ¶2 (1985)). Though the parties have not raised the question here, the Court is aware that conversion was traditionally limited to interference with property that could be lost and found, so it excluded intangible property. *See* RESTATEMENT (SECOND) OF TORTS, § 242, comments *d* and *e* (1965). At least some of the property the Debtor sold to the Moser Parties was intangible, for example, his covenant not to compete. However, the Court is convinced Kansas courts would recognize the Debtor's sale of his Limousine Business as a tort in the nature of conversion, even if the courts would conclude it did not qualify as conversion. *See Near v. Crivelle*, 673 F.Supp. 2d 1265, 1281-82 (D. Kan. 2009) (concluding Kansas courts would recognize liability similar to that for conversion for interference with intangible rights of ownership of a company).

[26]*Millenium Financial Servs., LLC, v. Thole*, 31 Kan. App. 2d 798, 808 (2003).

22

Purchase Agreement and the Pledge Agreement was property of the bankruptcy estate. The Debtor has not turned any of that money over to the Trustee. The Court also concluded at least the $50,000 the Moser Parties paid the Debtor under the Second Agreement for his covenant not to compete with them was property of the estate. The Debtor has not turned any of that money over to the Trustee, either. There can be no doubt the Debtor committed the unlawful overt act of converting at least $179,420 of the money the Moser Parties paid him, and he is liable to the Trustee for converting property of the estate. If the Trustee can prove the other elements required to show the Murphy Defendants conspired with the Debtor to accomplish that unlawful overt act, they can also be liable for the conversion.

For these reasons, the Court rejects the Murphy Defendants' claim that the Trustee cannot prove any of the alleged conspirators committed any unlawful act.

**F.     Sufficiency of the Trustee's evidence of a conspiracy to defraud the bankruptcy estate.**

The fraud the Trustee relies on is the Debtor's act of giving only the Second Agreement to his bankruptcy attorney, and telling him to give a copy to the Trustee. The Court agrees with the Murphy Defendants that the Trustee has not established for summary judgment purposes that Murphy knowingly or recklessly participated in that act, but cannot agree that the Trustee has presented insufficient evidence to permit a finding at trial that Murphy did so.

Various aspects of the Debtor's transaction with the Moser Parties might lead a

reasonable factfinder to conclude the Murphy Defendants knowingly participated with the Debtor in an effort to defraud the bankruptcy estate. Despite the Murphy Defendants' arguments to the contrary, the engagement letter appears to be a typical contract for an attorney to provide legal services, including legal advice, to the clients who signed copies of the letter, and Moser swears Murphy in fact gave him legal advice. Moser's assertions that Murphy gave him legal advice about his transaction with the Debtor do not contradict his first affidavit so dramatically that no reasonable factfinder could believe them; Moser's second affidavit simply added non-conflicting facts to those asserted in the first one. These circumstances would allow a factfinder to infer that Murphy played a major role in deciding how to structure the transaction, even though they don't require such an inference to be made. The Murphy Defendants assert that Murphy, the Debtor, and Moser reviewed the Debtor's bankruptcy filings and the holdings of the Debtor's business, and "the parties determined there were no hard assets of any value," so Murphy "revised the agreement to reflect the true nature of the transaction." But after hearing evidence of all the circumstances, a reasonable factfinder might easily conclude Murphy was the only one who reviewed the bankruptcy materials, reached that conclusion, and advised the Debtor and the Moser Parties to recast their transaction as a sale of the Debtor's services, rather than his Limousine Business. The factfinder might conclude, as the Trustee claims, that Murphy was the architect of the sale transaction. The fact the Second Agreement was actually signed more than a month after its stated effective date could lend further support to an inference the parties hoped to defraud the Trustee.

24

Murphy's drafting in January 2005 of the agreement for the Debtor to sell his business to Tess, in which Murphy called the transaction with the Moser Parties a sale of the Debtor's business, not a sale of his services, would support an inference that Murphy did not believe the transaction concerned only the Debtor's services. A reasonable factfinder might go on to conclude it was more likely than not that Murphy, intending to deceive the Trustee, advised the Debtor to give his bankruptcy attorney only the Second Agreement and ask the attorney to pass that document on to the Trustee, and therefore that Murphy had conspired with the Debtor to defraud the bankruptcy estate.

The Court notes both Murphy and the Debtor have signed affidavits swearing that Murphy was hired as a mere scrivener to record the Debtor and Moser's agreement and to provide absolutely no legal advice to either of them. These assertions come close to being "so utterly implausible in light of conceded or irrefutable evidence that no rational person could believe [them]." The Murphy Defendants' engagement letter certainly does not "expressly provide" that Murphy will provide the Debtor and Moser with no legal advice about their transaction, and instead, expressly provides the opposite. Furthermore, under Kansas law, "it is the general rule that in construing a contract between attorney and client, doubts are resolved against the attorney and the construction adopted which is favorable to the client."[27] Section 18(2) of the Restatement (Third) of the Law Governing Lawyers adds the sensible rule that, "(2) A tribunal should construe a contract between

---

[27]*Hitchcock v. Skelly Oil Co.*, 201 Kan. 260, 262 (1968) (citing *Kirwin v. McIntosh*, 153 Kan. 395 (1941)).

client and lawyer as a reasonable person in the circumstances of the client would have construe it."[28]  While the question would be different if Moser had joined the Debtor in saying Murphy was not supposed to and did not give them any legal advice, the provisions of the engagement letter could certainly have given a reasonable person in Moser's position the idea that Murphy was going to act as his and the Debtor's attorney for the transaction, and not as a mere scrivener who would offer no legal advice.

The Trustee's evidence is not so strong, however, that a reasonable factfinder must conclude the Debtor and the Murphy Defendants conspired to defraud the bankruptcy estate.  They have not conceded they acted with the required intent to deceive or reckless disregard for the truth, and the factfinder might accept their denials of fraudulent intent.

**G.      Sufficiency of the Trustee's evidence of a conspiracy to convert estate property.**

The Trustee's conversion claim against the Murphy Defendants is based on his claim that the Debtor sold property of the estate and kept the proceeds for himself.  This raises the question:  Since conversion is a strict liability tort, are the Murphy Defendants, no matter what they knew or intended, liable along with the Debtor because they helped him sell property of the estate to Moser in return for money that was proceeds of estate property and therefore was itself estate property?  On this question, the Trustee relies on *State ex rel. Mays v. Ridenhour*.[29]

---

[28]RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS, § 18(2) (2000).

[29]248 Kan. 919 (1991).

In *Ridenhour*, certain parties invested in a pyramid scheme and remained in the scheme long enough to reach the top and cash out of the pyramid, but did not themselves organize the scheme, actively promote it, or solicit others to join it. In a suit brought by the Kansas Securities Commissioner to enforce provisions of the Kansas Securities Act,[30] the Commissioner sought an injunction against those investors and disgorgement of the profits they received when they cashed out of the pyramid. On summary judgment, the trial court awarded that relief, and the investors appealed. There was no dispute the interests in the pyramid were unregistered securities that were not exempt from registration under the Securities Act, so any offer or sale of an interest was unlawful. The relevant question on appeal was whether a civil conspiracy theory could be applied to the investors to make them vicariously liable for the actions of those who created the pyramid scheme and actively solicited others to join it. The Kansas Supreme Court ruled a civil conspiracy theory could be used to define who was a seller of a security under the Securities Act.[31] The court rejected the investors' argument they did not commit any overt act in furtherance of the conspiracy. First, the court noted the trial court had found the investors knowingly joined in and associated with a venture they knew or should have known was unlawful, and willfully furthered the success of the venture by participating in it. Then the court concluded the investors committed an overt unlawful act in furtherance of the conspiracy when they cashed out of the pyramid scheme, receiving proceeds of

---

[30]K.S.A. 17-1252, *et seq.*

[31]248 Kan. at 927-35.

money paid in by new investors.[32]

The Trustee has not suggested the Murphy Defendants received any part of the Debtor's Limousine Business or of the money the Moser Parties paid the Debtor, so although they helped the Debtor convert estate property, unlike the investors in *Ridenhour*, they did not receive any proceeds of the Debtor's unlawful act and have none of them to disgorge.

Rather than indicating the Murphy Defendants are strictly liable for the Debtor's conversion of estate property, *Ridenhour* suggests the Murphy Defendants could be held vicariously liable for helping the Debtor convert that property only if they knew or should have known the Debtor's transaction with the Moser Parties was unlawful. Certainly once Moser told Murphy about the Debtor's bankruptcy case, Murphy should have known the property the Debtor was trying to sell might include property that belonged to the bankruptcy estate, and the Court has ruled the $50,000 the Moser Parties paid after that time for the Debtor's covenant not to compete was property of the estate. *Ridenhour* indicates that by drafting the Second Agreement after learning of the bankruptcy, Murphy committed an overt act in furtherance of the Debtor's unlawful conversion of estate property. Under that reading of *Ridenhour*, to the extent of $50,000, the Trustee has established the Murphy Defendants should be vicariously liable for the Debtor's conversion of estate property. The Trustee has not, however, presented conclusive

---

[32]*Id.* at 935.

evidence to show Murphy knew about the bankruptcy case before Moser told him about it, or otherwise knew the Debtor might not own some or all of the property he was selling to the Moser Parties.

In *Ridenhour*, the court said part of § 876 of the Restatement (Second) of Torts corresponded with the civil conspiracy theory of vicarious liability.[33]  The relevant part of § 876 reads:  "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him."[34]  The Restatement offers these comments about this provision:

> a.  Parties are acting in concert when they act in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result.  The agreement need not be expressed in words and may be implied and understood to exist from the conduct itself.  Whenever two or more persons commit tortious acts in concert, each becomes subject to liability for the acts of the others, as well as for his own acts.  The theory of the early common law was that there was a mutual agency of each to act for the others, which made all liable for the tortious acts of any one.

> b.   The same rule is applicable, in general, to tortious acts done pursuant to a common design or plan for cooperation in a tortious line of conduct or to accomplish a tortious end.  It is in connection with these common designs or plans that the word "conspiracy" is often used.  The mere common plan, design or even

---

[33]248 Kan. at 936.

[34]RESTATEMENT (SECOND) OF TORTS, § 876(a) (1979).  The first comment the Restatement authors make under § 876 is this:  "Caveat:  The Institute takes no position on whether the rules stated in this Section are applicable when the conduct of either the actor or the other is free from intent to do harm or negligence but involves strict liability for the resulting harm."  Since Kansas cases have called conversion a strict liability tort, this caveat might suggest the authors take no position about the need to intend to do harm or be negligent to be vicariously liable for conversion.  However, in comment *f* the authors make clear the Caveat is not referring to conversion but only to sections of the Restatement that address liability for the escape of animals and for abnormally dangerous conduct for which there is strict liability.

Case 05-06215    Doc# 375    Filed 12/21/10    Page 29 of 33

express agreement is not enough for liability in itself, and there must be acts of a tortious character in carrying it into execution. . . .

c.  In order for the rule stated in Clause (a) to be applicable, it is essential that the conduct of the actor be in itself tortious.  One who innocently, rightfully and carefully does an act that has the effect of furthering the tortious conduct or cooperating in the tortious design of another is not for that reason subject to liability.[35]

Comment *c* makes clear that the Murphy Defendants cannot be found liable for conspiring with the Debtor unless they knew or should have known the Debtor was committing an unlawful act by selling his Limousine Business to the Moser Parties and using the proceeds for his own purposes.  The Court predicts the Kansas Supreme Court would adopt this standard if it were presented with the question now before this Court.

Comment *c* to § 876(a) bolsters the view that *Ridenhour* means the Murphy Defendants are liable with the Debtor for $50,000 of the money paid under the Second Agreement, but that the Trustee has not established for summary judgment purposes that they are liable for the money the Debtor converted before Moser told Murphy about the Debtor's bankruptcy case.

Since the Trustee no longer alleges Murphy received or otherwise directly dealt with any of the converted property, there is no claim the Murphy Defendants are strictly liable to the estate based on Murphy's actions alone.  Once Murphy learned of the Debtor's bankruptcy case, though, he should have investigated the Debtor's ability to carry out the transaction with Moser, and should have learned the Debtor was trying to

---

[35]RESTATEMENT (SECOND) OF TORTS, § 876, comments to clause (a).

sell property that belonged to the bankruptcy estate. The materials presented do not conclusively establish that Murphy should have known the Debtor's transaction with Moser was an unlawful act before Moser told him about the bankruptcy case. However, the materials do not conclusively establish a reasonable factfinder could not find that to be true. Consequently, except with respect to the $50,000 paid under the Second Agreement for the covenant not to compete, neither side is entitled to summary judgment on the question whether the Murphy Defendants conspired with the Debtor to convert the money paid under the Stock Purchase and Pledge Agreements.

**H.     The Trustee's claim for attorney fees**

The Murphy Defendants argue the Trustee has not stated a valid claim for attorney fees because his amended complaint offers no legal basis for him to recover them. In a separate opinion addressing a motion the Trustee filed in the Debtor's main bankruptcy case seeking sanctions against the Murphy Defendants for allegedly violating the automatic stay, the Court has rejected the Murphy Defendants' effort to prevent the Trustee from claiming attorney fees based on those alleged violations. Consequently, the Murphy Defendants' request for summary judgment on the Trustee's claim for attorney fees must be denied.

The Court agrees with the Trustee that the Murphy Defendants violated the automatic stay by participating in the Debtor's sale to the Moser Parties because they

were "exercis[ing] control over property of the estate."[36]  As declared in the opinion

concluding the Trustee could seek sanctions against the Murphy Defendants for violating

the stay, he may try to recover attorney fees as a civil contempt sanction under § 105(a).

Under that provision, however, contempt sanctions are appropriate only for a knowing

and willful violation of the automatic stay,[37] and not for an inadvertent violation.[38]

    At this point, the Court is convinced that by the time the Second Agreement was

drafted, the Murphy Defendants knew of the Debtor's bankruptcy case and at least should

have known the $50,000 paid under the Second Agreement for the Debtor's covenant not

to compete was property of the estate, so they knowingly and willfully violated the stay

by helping the Debtor sell the property without getting the Trustee's consent or the

Court's approval.  But the evidence has not established that the Murphy Defendants had

any reason to know about the automatic stay before Moser told Murphy about the

Debtor's bankruptcy case.  The Court declines to determine now whether to impose

attorney fees as a sanction for the limited knowing and willful stay violation the Trustee

has established, and will instead wait until all the Trustee's claims are resolved before

deciding whether and to what extent the Murphy Defendants should be sanctioned for

violating the stay.

---

[36]11 U.S.C.A. § 362(a)(3).

[37]In *In re Skinner*, 917 F.2d 444, 447-50, (10th Cir. 1990) (*per curiam*), the Tenth Circuit ruled a bankruptcy court properly imposed sanctions for civil contempt on a creditor that had notice of the automatic stay before it sold the debtors' car and then failed to restore debtors to the status quo after learning sale was in violation of automatic stay.

[38]3 *Collier on Bankruptcy*, ¶ 362.11[2] (Resnick & Sommer, eds.-in-chief, 15th ed. rev. 2010).

**Conclusion**

For these reasons, the Court concludes the Trustee is entitled to a summary judgment declaring the Murphy Defendants are liable for conspiring with the Debtor to convert the $50,000 paid under the Second Agreement for his covenant not to compete. Otherwise, the parties' summary judgment motions must be and they are hereby denied.

# # #